STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v. JAMES EARL WILLIAMS, DEFENDANT-RESPONDENT.

Argued October 13, 1971—Decided December 6, 1971.

494

*Mr. Joseph A. Fusco,* Assistant Prosecutor, argued the cause for appellant (*Mr. Joseph P. Lordi,* Essex County Prosecutor, attorney).

*Mr. Jack I. Doppelt* argued the cause for respondent.

The opinion of the Court was delivered by

WEINTRAUB, C. J. Defendant Williams was convicted of false swearing. The Appellate Division reversed, finding defendant was denied his Fifth Amendment privilege against self-incrimination, 112 *N. J. Super.* 563 (App. Div. 1970). We granted certification, 58 *N. J.* 161 (1971). We affirm the judgment of the Appellate Division but for reasons other than those it gave.

This case involves the recurring problem of a recanting State's witness in a criminal prosecution. Williams gave a sworn statement to the prosecutor identifying Willie James Washington as the perpetrator of a homicide. Before the grand jury considering the charge against Washington, Williams wavered but finally reiterated the substance of the sworn statement and on the basis of that testimony Washington was indicted for murder. In preparing for the murder trial, the prosecutor learned from Williams that he would not repeat that testimony. Having no case without the testimony of Williams, the State subpoenaed him to testify at a pretrial hearing in the homicide matter to determine whether he would, under oath, recant. Williams did recant, the murder indictment was dismissed, and Williams was then indicted for false swearing, the charge involved upon this appeal.

■ We should say a word about the procedure thus employed to determine whether Williams would or would not adhere to his sworn statement. In *State v. Guido*, 40 *N. J.* 191, 199–200, 191 A. 2d 45, 50 (1963), we said:

We should add an observation with respect to the problem posed by the State's plea of 'surprise' to Vella's testimony. It is perfectly apparent that before Vella was called, the State had been told it would get the very answers he gave but nonetheless it called him to the stand. Defendant says the prosecutor therefore was not 'surprised' by the disappointing answers and neutralization should not have been permitted, citing *State v. Caccavale*, 58 *N. J. Super.* 560, 573 (App. Div. 1959). As the Appellate Division there said, in some cases there may be residual harm despite a trial court's firmest effort to erase what is revealed before the jury in the neutralizing process. Yet the State should not be compelled to accept an unsworn disavowal,

for it may not really know whether the witness will, under oath, maintain the second story. *Cf. State v. DeCola*, 33 *N. J.* 335, 351 (1960). We think that fairness can be assured in the following way. When counsel has been advised a witness will not adhere to a prior statement but feels he should test that disavowal under oath, he should so inform the court at side bar. The witness should then be examined in the absence of the jury. So much of his testimony as is not neutralized may then be repeated in its presence.

In the case at hand, the State did not await the trial of the homicide charge to learn whether Williams would recant under oath, and probably did not do so because it knew the murder indictment would fall if Williams did repudiate his original statement. Hence the expeditious course was to have a pretrial hearing in the homicide case. The Appellate Division, 112 *N. J. Super.* at 566, found this procedure was consonant with *Guido,* and we agree. We turn then to the meritorious issue.

*N. J. S. A.* 2A:131-4 provides:

Any person who willfully swears falsely in any judicial proceeding or before any person authorized by any law of this state to administer an oath and acting within his authority, is guilty of false swearing and punishable as for a misdemeanor.

*N. J. S. A.* 2A:131-5 reads:

If a person has made contrary statements under oath, it shall not be necessary to allege in an indictment or allegation which statement is false but it shall be sufficient to set forth the contradictory statements and allege in the alternative that one or the other is false.

Proof that both statements were made under oath duly administered is prima facie evidence that one or the other is false; and if the jury are satisfied from all the evidence beyond a reasonable doubt that one or the other is false and that such false statement was willful, whether made in a judicial proceeding or before a person authorized to administer an oath and acting within his authority, it shall be sufficient for a conviction.

The false swearing indictment was framed wholly in terms of the section last quoted. It charged that in the sworn statement given in the investigation Williams said he saw Wash-

ington fire the fatal shots whereas in the pretrial testimony in the homicide case, Williams swore that he did not know who the assailant was. The indictment then averred that Williams "on either of the aforesaid dates mentioned, did willfully swear falsely in that one or the other aforesaid contrary statements * * * were false."

At his trial, Williams testified that the first sworn statement was extorted by detectives by threats of physical harm, whereas the State's testimony was that Williams, in saying he would not stay with his first version, gave as his reason that he feared for his life if he testified against Washington, and therefore would choose a jail term for false swearing. Thus in the trial the State actually focused its charge of falsity upon the final testimony. But the indictment was not so framed, for as we have mentioned, it alleged falsity in either of the inconsistent statements, and the charge to the jury followed the indictment and called for a guilty verdict if willful falsity was found with respect to either of the sworn statements.

Thus the jury, in finding Williams guilty, was permitted to use his testimony in the pretrial hearing in the homicide case to find that his initial sworn statement was false. The Fifth Amendment issue stems from that circumstance. Williams was compelled by subpoena to testify in the pretrial hearing in the murder case. He did not assert a privilege against self-incrimination with respect to a charge arising out of his prior statements. Nor had he been advised of his right to assert a privilege in that regard. The assistant prosecutor did warn Williams that if he departed from his first sworn statement, he might be liable to conviction for false swearing, but the assistant prosecutor did not tell Williams that under *State v. DeCola*, 33 *N. J.* 335 (1960), he could assert his Fifth Amendment privilege and thereby avoid the use of a compelled answer in a prosecution which charged falsity in his earlier sworn statement.

In *DeCola* the State learned through a newspaper account that a witness, Mrs. Hansen, who had testified before a grand

jury in a homicide case, would not testify at the trial of the indictment. She was summoned before a second grand jury and asked the same questions she had answered before the first grand jury. Claiming the privilege against self-incrimination, she refused to answer even when ordered by the court to do so, whereupon she was convicted of contempt. She was then subpoenaed to testify at the murder trial where she again refused to answer, asserting her Fifth Amendment privilege. The basis of the plea was an unparticularized assertion that her testimony might reveal perjury in her first grand jury testimony. The trial court ordered her to answer, and when she declined, she was again convicted of contempt.

Starting with the settled rule that the trial judge is not to accept the witness' mere statement that the answer will tend to incriminate him, 33 *N. J.* at 350, we found it impossible for the trial court to decide on a naked claim of privilege whether the witness was really concerned about a charge of falsity in the prior testimony. We noted that in this area, the fear is not academic "that the claim of privilege may be spurious; that because of bribe, threat, or a purpose to favor another, a witness who speaks before a grand jury may later assert the privilege to cloak nothing but a refusal to repeat the truth." 33 *N. J.* at 349, 164 A. 2d at 736. Hence we said that "If we assume Mrs. Hansen was stating inferentially that she would not adhere to her prior testimony, still there is no intelligent basis for determining whether she did face a peril. For all the court may know, the inferential assertion may be false, her original testimony may be the truth as she understands it, and hence if she is compelled to answer, her testimony will coincide with her prior testimony." 33 *N. J.* at 351, 164 A. 2d at 737. Upon a balancing of the competing values discussed at length, 33 *N. J.* at 344–352, we concluded that the witness' claim of privilege must be overruled, but that the witness will be protected from the use of her compelled testimony in any charge that she swore falsely in prior testimony. *Cf. United States v. Blue,* 384 *U. S.* 251, 255, 86 S. Ct. 1416, 16 *L. Ed.* 2d 510, 514 (1966).

But we stressed that Mrs. Hansen could be charged with perjury or false swearing in her compelled testimony, for the Fifth Amendment protects a witness only with respect to disclosure of a past offense and does not entitle the witness to commit perjury in the testimony given under an order to testify. 33 *N. J.* at 354. See *State v. Toscano,* 13 *N. J.* 418, 423, 425 (1953); *United States v. Knox,* 396 *U. S.* 77, 82, 90 S. Ct. 363, 24 *L. Ed.* 2d 275, 280 (1969); *United States v. Kahriger,* 345 *U. S.* 22, 32, 73 S. Ct. 510, 97 *L. Ed.* 754, 763 (1952); *Glickstein v. United States,* 222 *U. S.* 139, 142, 32 S. Ct. 71, 56 *L. Ed.* 128, 130 (1911); *Robinson v. United States,* 401 *F.* 2d 248, 251 (9 Cir. 1968); *United States v. Orta,* 253 *F.* 2d 312, 314 (5 Cir. 1958), *cert.* denied, 357 *U. S.* 905, 78 S. Ct. 1149, 2 *L. Ed.* 2d 1156 (1958); *People v. Tomasello,* 21 *N. Y.* 2d 143, 287 *N. Y. S.* 2d 1, 234 *N. E.* 2d 190, 192–193 (Ct. App. 1967); see also *Harris v. New York,* 401 *U. S.* 222, 91 S. Ct. 643, 28 L. Ed. 2d 1, 4 (1971). And, of course, if charged with falsity in the compelled testimony, the prior testimony would be admissible in support of the charge, 33 *N. J.* at 354, but the compelled testimony may not be used to prove the commission of a crime in the prior testimony. We expressly considered the impact of that holding upon the use of the statute here involved, *N. J. S. A.* 2A:131–5, saying that "the testimony compelled over the claim of privilege could not be used to show falsity in the earlier testimony and hence the cited section could not be invoked to deal with contrary statements." 33 *N. J.* at 353, 164 A. 2d at 738. The State would avoid *DeCola* because Williams did not assert his privilege against self-incrimination in his compelled testimony. The question is whether he was entitled to be counseled in that regard.

The Appellate Division held Williams was entitled to warnings and offer of counsel under *Miranda v. Arizona,* 384 *U. S.* 436, 86 S. Ct. 1602, 16 *L. Ed.* 2d 694 (1966). Long before *Miranda,* the rule was settled that the suspect must be warned that what he says may be used against him and that he has a right to be silent. *Miranda* added the

further, controversial requirement that the prisoner must also be told that he is entitled to consult counsel and to have him present during the questioning and to be furnished an attorney without charge if he cannot afford one. *Miranda*, in its own words, dealt "with the admissibility of statements obtained from an individual who is subjected to custodial police interrogation." 384 *U. S.* at 439, 86 S. Ct. at 1609, 16 *L. Ed. 2d* at 704. We have read *Miranda* to apply only to such custodial interrogation by the police, and to have introduced a right to counsel "solely to counteract the coercion of custodial interrogation." *State v. McKnight,* 52 *N. J.* 35, 54, 243 A. 2d 240, 251 (1968). Thus we held *Miranda* did not apply to the questioning of a man in a hospital and then in his home when there was no arrest or police restraint with respect to his freedom of action. *State v. Zucconi,* 50 *N. J.* 361, 364 (1967).

In the case before us, the Appellate Division found, 112 *N. J. Super.* at 567, that Williams, who was in jail on an unrelated charge, was in "police custody" within the meaning of *Miranda* when he sat in the witness box in open court in the presence of a judicial officer. With this, we cannot agree, for there was no semblance of the "custodial police coercion" with which *Miranda* was concerned.[1] Rather we agree with the decisions elsewhere which hold that *Miranda* does not apply to a witness in court, *Beckley v. State,* 443

---

[1]Ambiguity within *Miranda* has led to a split of views upon almost every conceivable application of the case. See Annotation, 31 *A. L. R. 3d* 565 (1970). One point of disagreement is whether the fact that the person is a suspect is enough to call for the *Miranda* warning as to the right to seek counsel. We do not read *Miranda* to equate "custodial interrogation" with the "focus" of an investigation upon a suspect which was found to be a triggering event in *Escobedo v. Illinois,* 378 *U. S.* 478, 12 *L. Ed. 2d* 977 (1964). The "focus" concept was too vague to be realistic and serviceable. No doubt for that reason, *Miranda* explained that concept away, saying, 384 *U. S.* at 444, 86 S. Ct. at 1612, 16 *L. Ed. 2d* at 706:

By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.[4] [fn. 1 con't p. 502]

*P. 2d* 51, 53 (Alaska Sup. Ct. 1968); *People v. Williams,*
265 Cal. App. 2d 888, 71 *Cal. Rptr.* 773, 779 (Ct. App.
1968), or to a witness before a grand jury, *Robinson v.
United States,* 401 *F. 2d* 248, 251 (9 Cir. 1968); *State ex
rel. Lowe v. Nelson,* 202 *So. 2d* 232 (Fla. Ct. App. 1967),
affirmed, 210 *So. 2d* 197 (Fla. Sup. Ct. 1968); *Common-
wealth v. McCloskey,* 443 *Pa.* 117, 277 *A. 2d* 764, 766–767
(Sup. Ct. 1971); *cf. Nicholi v. State,* 451 *P. 2d* 351 (Alaska
Sup. Ct. 1969); but see *State v. Ruggeri,* 19 *Utah 2d* 216,
429 *P. 2d* 969 (Sup. Ct. 1967).

 The general rule remains that it lies with the wit-
ness to assert his privilege against self-incrimination. *State
v. Fary,* 19 *N. J.* 431, 435–436 (1955); *Quinn v. United
States,* 349 *U. S.* 155, 162–165, 75 *S. Ct.* 668, 99 *L. Ed.* 964,
972–973 (1955); *Emspak v. United States,* 349 *U. S.* 190,
194–195, 75 S. Ct. 687, 99 *L. Ed.* 997, 1003–1004 (1955);

and then in footnote 4:
This is what we meant in Escobedo when we spoke of an in-
vestigation which had focused on an accused.
Although *Miranda* might be read, very literally, to find the two
thoughts to be equivalent, the sense of *Miranda* is that "custodial
interrogation," rather than a mere "focus" upon a particular sus-
pect, is what will generate the right to advice about, and the offer
of, counsel. With respect to any suggestion that *Miranda* applies to a
witness testifying in open court, we note that *Miranda* said, 384 *U. S.*
at 461, 86 S. Ct. at 1621, 16 *L. Ed.* at 716:
* * *An individual swept from familiar surroundings into police
custody, surrounded by antagonistic forces, and subjected to the
techniques of persuasion described above cannot be otherwise than
under compulsion to speak. As a practical matter, the compulsion
to speak in the isolated setting of the police station may well be
greater than in courts or other official investigations, where there
are often impartial observers to guard against intimidation or
trickery.
This right as to counsel was found by *Miranda,* not because the
Sixth Amendment applied, but rather as a measure to safeguard a
prisoner's right against self-incrimination. At several places *Miranda*
said that its rule as to counsel would not apply if a State devised
some other method of protecting the Fifth Amendment right, 384
*U. S.* at 444, 479, 490, 86 S. Ct. 1602, 16 *L. Ed. 2d* at 706, 726, 732,
a proposition which could not be advanced if the Sixth Amendment it-
self were constitutionally applicable.

*United States v. Kordel,* 397 *U. S.* 1, 9–10, 90 S. Ct. 763, 25 *L. Ed. 2d* 1, 9 (1970) ; 8 *Wigmore, Evidence (McNaughton,* 1961), § 2268, *p.* 402. This does not mean that a judge may not advise a witness of his Fifth Amendment right. It is usually said that a judge may, but need not, do so. *State v. Fary, supra,* 19 *N. J.* at 435; *State v. Cassatly,* 93 *N. J. Super.* 111, 121–122 (App. Div. 1966), *cert.* denied, 48 *N. J.* 448 (1967) ; 8 *Wigmore, Evidence (McNaughton* 1961), §§ 2269–70, *pp.* 412–19 ; 98 *C. J. S. Witnesses* § 449, *p.* 286 ; but see *State v. Mohr,* 99 *N. J. L.* 124, 129 (E. & A. 1923). Our point is that *Miranda* did not lay this body of law to rest. It did not say that a witness under subpoena need no longer claim his privilege, and indeed that the witness is entitled to the panoply of warnings and advice which *Miranda* found necessary to protect the right not to incriminate oneself from police coercion to relinquish that right.

█ The Appellate Division also found support in our cases holding that the "target" of a grand jury proceeding must be advised that he is a target and of his right not to incriminate himself, failing which an indictment based upon his testimony will be quashed. *State v. Fary, supra,* 19 *N. J.* at 438; *State v. Browning,* 19 *N. J.* 424 (1955) ; *State v. DeCola, supra,* 33 *N. J.* at 342–344; *In re Addonizio,* 53 *N. J.* 107, 117 (1968). That doctrine is not applicable here, for Williams was not called to testify before the grand jury which indicted him. He was a witness in proceedings against the defendant in the murder case. Nor in fact was the indictment of Williams the object of the subpoena served upon him to testify in the murder case. The purpose plainly was to advance the prosecution of the homicide indictment. A charge against Williams, though a likely consequence of a recantation, was not what the State was seeking. Nor can it be said that the State knew that Williams would recant, for the State could not know until his answers were given. Hence the present situation does not come within the "target" cases.

Neither *Miranda* or its predecessors nor the "target" cases apply for a further reason. Those cases call for advice that a person need not answer. Under *DeCola* it would be futile and misleading to tell the witness that he need not testify, for *DeCola* requires that he answer, on the pain of conviction for contempt. The utility of a Fifth Amendment plea here lies not in assuring a right to be silent, but rather in protecting the witness against the use of the compelled answer to prove his commission of crime in prior testimony.

▋ For those reasons we do not accept the bases upon which the Appellate Division grounded its judgment in this case. But the question remains whether, apart from *Miranda* and the "target" cases, a reluctant witness who has advised the State that he will depart from a sworn statement, should not, in fairness, be told that, although he will have to answer, nonetheless he can protect himself from self-incrimination with respect to prior statements by asserting a privilege against that incrimination and answering only in response to the court's order to do so.

The question, of course, is not whether every witness who contradicts earlier testimony should be automatically immunized from the use of his second statement to prove perjury or false swearing in his prior testimony. We are speaking only of a witness who informs the prosecutor that he will not stay with his sworn statement and who nonetheless is subpoenaed by the State to testify. It seems to us that in such circumstances the witness should be told of his right to claim protection under *DeCola*. The aim of *DeCola* is to protect the State's proper interest in compelling the disclosure of the truth. But the State has no legitimate basis to call upon a court to compel a man to give evidence of the commission of a crime in prior testimony. Nor can it matter that the State contends the witness told its officer that his earlier testimony was true and that his compelled testimony will be false, for the State's claim in that regard goes to the heart of a charge of falsity in the first testimony and the witness cannot be denied his right to dispute that

factual assertion upon the trial of an indictment charging him with that crime.

The State does correctly say that in fact the case was tried on the thesis that Williams lied in his compelled testimony. Had the indictment charged false swearing in the compelled testimony and had the case gone to the jury on that theme, there would have been no problem for Williams would not have been harmed by the failure to advise him of his privilege under *DeCola*. But the trial court submitted the case to the jury upon the thesis of the indictment, and hence, apart from the problem of variance if the trial were upon the thesis that willful falsity inhered in the compelled testimony, we cannot know whether the jury found willful falsity in the prior sworn statement. Williams having been convicted, we may assume the jury rejected his claim that his first statement was the product of the alleged threats of the police officers. But there was another basis upon which the jury could have found that he lied in his first statement. Williams was being held on some other charge at the time of the first statement. From that fact the jury could have found that Williams falsely implicated Washington in the hope of gaining consideration for himself. In that process, of course, the jury would have used the compelled testimony against him.

For the reasons we have given, the judgment of the Appellate Division is affirmed.

*For affirmance*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and MOUNTAIN—7.

*For reversal*—None.